COURT OF APPEALS
DECISION
DATED AND FILED

January 18, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1876-CR**

Cir. Ct. No. 2017CF572

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

TOMAS JAYMITCHELL HOYLE,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Chippewa County: JAMES M. ISAACSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Tomas Jaymitchell Hoyle appeals a judgment of conviction for two counts of second-degree sexual assault and two counts of

second-degree sexual assault of a child. Hoyle also appeals an order denying his motion for postconviction relief. Hoyle argues that he is entitled to a new trial based on newly discovered evidence. Alternatively, Hoyle argues that if this court rejects his newly discovered evidence claim, we should remand for a new hearing on that claim so that he may subpoena the victim and her counseling records. Hoyle also asserts that he is entitled to a new trial based on the State's failure to disclose evidence.[1]

¶2    We conclude that the circuit court properly denied Hoyle's newly discovered evidence claim because there is no reasonable probability that the jury would have had a reasonable doubt about Hoyle's guilt if it had heard the newly discovered evidence. We further conclude that no remand is required because the victim's counseling records are not necessary to decide Hoyle's newly discovered evidence claim. Finally, we conclude that Hoyle is not entitled to a new trial based on the State's failure to disclose evidence because the evidence in question is not material. We therefore affirm.

---

[1] This court previously reversed Hoyle's convictions and remanded for a new trial based on our conclusion that the prosecutor improperly commented on Hoyle's exercise of his Fifth Amendment right to remain silent. *State v. Hoyle*, No. 2020AP1876-CR, unpublished slip op. ¶¶1-2 (WI App Apr. 26, 2022). Because we reversed on that basis, we did not address Hoyle's arguments regarding newly discovered evidence, postconviction discovery of the victim's counseling records, and the State's failure to disclose evidence. *Id.*, ¶¶1 & n.1, 2.

The Wisconsin Supreme Court subsequently reversed our decision, concluding that the prosecutor at Hoyle's trial did not improperly comment on Hoyle's exercise of his right to remain silent. *State v. Hoyle*, 2023 WI 24, ¶¶1-3, 406 Wis. 2d 373, 987 N.W.2d 732. The supreme court remanded the matter to this court for us to address the other issues that Hoyle raised on appeal, and we now do so.

## BACKGROUND

¶3    In March 2017, fifteen-year-old Hannah[2] reported to law enforcement that she had been sexually assaulted the previous month. Although Hannah did not initially disclose the identity of her assailant, in May 2017, she named Hoyle as the person who had sexually assaulted her. The State subsequently charged Hoyle with two counts of second-degree sexual assault and two counts of second-degree sexual assault of a child. The case proceeded to a jury trial in December 2018.

¶4    At trial, Hannah testified that one day in February 2017, she left her home and was on her way to a friend's house to tell the friend that Hannah's mother would not allow Hannah to sleep over. Hannah expected this errand to take about five or ten minutes. She testified that she was "high" or "buzzed" at the time, having taken "numerous" Vicodin pills and consumed "numerous" alcoholic drinks throughout the day. Hannah admitted that she did not have a prescription for Vicodin and had taken her sister's pills.

¶5    While Hannah was on the way to her friend's house, Hoyle—who was the stepbrother of Hannah's former best friend—"drove through and asked if [she] wanted to hang out." Hannah got into the front passenger seat of Hoyle's vehicle and told him that she could only hang out for about five minutes. She described Hoyle's vehicle as a small, four-door sedan with gray fabric in the interior, a center console in the front seat, and no center console in the back seat.

---

[2] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2021-22), we use a pseudonym instead of the victim's name. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

3

¶6    Hannah testified that Hoyle initially drove to the Wissota Marina near the Lafayette Town Hall. He then turned around in a parking lot across from the marina and started to drive back toward the trailer court where Hannah lived. Instead of dropping Hannah off at the trailer court, however, Hoyle continued driving toward Cadott. Hannah could not recall how far toward Cadott they went, but she "remember[ed] crossing a bridge and a couple of bars." Hannah testified that she "didn't say anything" when Hoyle failed to stop at the trailer court, but she was "kind of confused." As they drove, Hoyle kept telling Hannah to sing along with a song playing on the radio, which she did not want to do, and he "kept poking [her] legs."

¶7    Hoyle ultimately turned onto a dead-end road and stopped the vehicle. Hannah got out of the car. She testified that she was confused and did not have a plan, but Hoyle's behavior seemed "weird" to her. Hoyle told her to get back into the car. She then got into the car's back seat because she was "scared" and did not want Hoyle touching her anymore, and she thought that "by sitting in the back, he wouldn't have access to touching [her]."

¶8    Hannah testified that she thought Hoyle would bring her home after she got back into the car. Instead, Hoyle climbed into the back seat and moved close to her, which made her feel uncomfortable. Hoyle started touching Hannah, grabbing her hands, and rubbing his hands on her upper thighs. He then started pulling Hannah's pants down. Hannah tried to pull her pants back up and told Hoyle to stop, but he was ultimately successful in removing both her pants and her underwear.

¶9    Hannah testified that she was scared. She told Hoyle that she needed to go home because "it was past five minutes" and her "mom [was] going to be

4

getting worried." Hoyle then grabbed Hannah's waist and pulled her body down, so that she was lying flat on the back seat of the car. He moved his body on top of Hannah and inserted his fingers into her vagina for a few seconds. Hannah testified that she did not want to be touched that way and did not give Hoyle permission to do so. Hoyle then inserted his penis into Hannah's vagina. When Hannah told Hoyle that she might end up pregnant, he responded, "Don't worry about it, you won't." Hoyle continued to assault Hannah for "[a] couple of minutes" until she "forcefully push[ed] him off" and started to get dressed.

¶10    Hannah testified that after the assault, she returned to the front seat of the car, and Hoyle drove her to a tavern across the street from the trailer court where she lived. According to Hannah, before dropping her off, Hoyle "said that if anyone finds out about this, someone is going to end up dead," and Hannah understood that the "someone" would be her.

¶11    After Hannah testified regarding the details of the assault, the prosecutor asked her about her testimony at the preliminary hearing that she had taken six Vicodin pills and consumed three shots of vodka on the day in question. Hannah explained that her prior testimony was merely a "rough estimate" and she did not know—either at the time of the preliminary hearing or at trial—how much Vicodin or alcohol she had consumed that day.

¶12    Hannah then testified that the first person she told about the assault was "Officer Nelson," a school resource officer. Nelson subsequently turned the investigation over to Investigator Kari Szotkowski, formerly known as Kari Anderson. Hannah testified that she did not initially tell Szotkowski the name of the person who assaulted her because she was scared. She ultimately identified Hoyle as her assailant while speaking to Nelson in May 2017. She

5

explained that Nelson "was kind of the person that I talked to, not really like a counselor, but if I had any issues, that's who I talked to."

¶13    Finally, the prosecutor asked Hannah whether it was easy for her to talk about the assault, and Hannah responded that it was not because the assault was "very uncomfortable and traumatic." The following exchange then occurred:

> Q. You mentioned that it's traumatic to you today and upsetting to you today. Is there a reason why you are not crying now?
>
> A. I have gotten counseling to help with dealing with this.
>
> Q. So because it has happened so long ago, you've had professional help in dealing with the repercussions of what occurred.
>
> A. Correct.
>
> Q. So it's not that it doesn't affect you; it's that you are now better able to deal with it.
>
> A. Correct.
>
> Q. So just because you're not crying here today doesn't mean you're not sad about what occurred to you.
>
> A. Correct.
>
> Q. Do you still go to counseling for this?
>
> A. Yes.
>
> Q. And your counseling, is it related to just this or everything that's gone on in your life, like the stuff with your mom?
>
> A. Correct, everything.
>
> Q. So it's everything. So you talk both about issues with your mom, life in general, and this assault.
>
> A. Yes.
>
> Q. Are they able to help you process through this?

A. Yes.

Q. So as you mentioned, your ability to deal with it gets better and better as you deal with it professionally?

A. Correct.

¶14 On cross-examination, Hannah conceded that she could not remember whether the assault occurred before or after Valentine's Day in February 2017. She testified that she remembered taking three shots of alcohol that day, but she could not remember how many pills she took. Hannah also testified on cross-examination that she was away from home for about forty-five minutes on the day of the assault. Although her mother "demand[ed] an explanation of where [she] had been" when she returned home, she did not tell her mother, her stepfather, or her sisters about the assault.

¶15 Following Hannah's testimony, Investigator Szotkowski testified briefly regarding her investigation of Hannah's allegations. Hoyle elected not to testify in his own defense, and the defense rested without presenting any evidence. The jury convicted Hoyle of all four of the charges against him.

¶16 Hoyle then moved for postconviction relief. He raised multiple claims, three of which are relevant to the present appeal. First, Hoyle sought a new trial based on newly discovered evidence, on the grounds that Hannah told the author of the presentence investigation report (PSI) that she was attending counseling for substance abuse only and had not "discussed the sexual assault with her counselor because she [did] not want to constantly relive the assault." Hoyle argued that this statement was contrary to Hannah's trial testimony that she had received counseling that helped her deal with the effects of the assault. Second, Hoyle argued that if the circuit court did not grant him a new trial based on newly discovered evidence, then he was entitled to postconviction discovery of Hannah's

counseling records so that he could file an amended postconviction motion based on those records. Third, Hoyle asked for a new trial based on the State's failure to disclose evidence regarding Hannah's initial disclosure of the assault to Officer Nelson. The court denied Hoyle's motion for postconviction relief on all grounds, and this appeal follows.

## DISCUSSION

### I. Newly discovered evidence

¶17    To obtain a new trial based on newly discovered evidence, a defendant must prove four factors: "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." *State v. Plude*, 2008 WI 58, ¶32, 310 Wis. 2d 28, 750 N.W.2d 42. If the defendant establishes each of these factors, the court must then determine whether there is a "reasonable probability" that the jury would have had a reasonable doubt as to the defendant's guilt if it had heard the newly discovered evidence. *Id.*

¶18    Whether to grant or deny a motion for a new trial based on newly discovered evidence is committed to the circuit court's discretion. *Id.*, ¶31. However, whether there is a reasonable probability that the jury would have had a reasonable doubt as to the defendant's guilt is a question of law that we review independently. *Id.*, ¶33.

¶19    In this case, the State concedes that the evidence in question—namely, Hannah's statement to the PSI author that she had not discussed the sexual assault with her counselor—meets the first four factors of the newly

discovered evidence test. The disputed issue is whether there is a reasonable probability that the jury, having heard this evidence, would have had a reasonable doubt as to Hoyle's guilt.

¶20 Hoyle asserts that the requisite reasonable probability exists because the State's case "relied exclusively on [Hannah's] credibility," and there was "absolutely no corroborating physical evidence or witness testimony." For instance, Hoyle emphasizes that there were no cell phone tower records showing that he was in the area of the alleged assault at any point during the alleged time frame, nor was there evidence that he owned or had access to a car matching the description that Hannah provided. Hoyle also notes that, although Hannah testified that her mother was upset that she was gone for forty-five minutes on the day of the assault, the State did not "call to the stand either [Hannah's] friend or any of [Hannah's] family members to testify about a time [Hannah] was out of the house unexpectedly," and Investigator Szotkowski conceded that she did not interview any of those potential witnesses.

¶21 Given this lack of corroborating evidence, Hoyle argues that the prosecutor "undoubtedly was aware" that Hannah's demeanor was critical to the jury's assessment of her credibility. Hoyle contends that the prosecutor "must have been concerned with [Hannah's] unemotional affect, and so solicited testimony [that she had received counseling for the assault] to explain her demeanor." Hoyle therefore argues that the newly discovered evidence regarding Hannah's lack of counseling for the sexual assault "went straight to the heart of the critical issue at trial: whether [Hannah's] demeanor during her testimony [lent] her enough credibility to convince the jury of Hoyle's guilt beyond a reasonable doubt." Hoyle further argues that "[i]f the jury heard that shortly after trial [Hannah] claimed that she had not received any treatment, the jury could

9

reasonably conclude that her demeanor was not because she received counseling, but because the assault did not actually happen."

¶22 "Wisconsin law has long held that impeaching evidence may be enough to warrant a new trial." *Plude*, 310 Wis. 2d 28, ¶47.

> For example, in *Plude*, the main issue at trial was whether Plude drowned his wife Genell by forcing her head in the toilet. 310 Wis. 2d 28, ¶4, 750 N.W.2d 42. The testimony of several doctors was inconclusive as to the cause of death, but the testimony of the State's expert, Saami Shaibani, was that Plude drowned his wife. *Id.*, ¶25. Shaibani testified that he was an expert in "injury mechanism analysis," a combination of physics, trauma, and engineering. *Id.*, ¶23. He conducted a series of experiments and concluded that Genell could not have inhaled toilet bowl water on her own. *Id.*, ¶37. After Plude was convicted, newly discovered evidence revealed that Shaibani falsified his credentials. *Id.*, ¶36. [The supreme] court concluded that "in a trial rife with conflicting and inconclusive medical expert testimony … there exists a reasonable probability that, had the jury discovered that Shaibani lied about his credentials, it would have had a reasonable doubt as to Plude's guilt." *Id.*

*State v. Avery*, 2013 WI 13, ¶28, 345 Wis. 2d 407, 826 N.W.2d 60.

¶23 Hoyle argues that "[t]he newly discovered evidence both here and in *Plude* involved evidence bolstering the key witness's credibility." Hoyle therefore asserts that, as in *Plude*, there is a reasonable probability that the jury in this case would have had a reasonable doubt about his guilt had it heard the newly discovered evidence.

¶24 We disagree. In *Plude*, the newly discovered evidence that Shaibani had lied about his credentials undercut the entire basis for his expert testimony about how the victim died. Shaibani's testimony on that point was critical to the jury's determination of Plude's guilt, given that the other experts' testimony

10

regarding the victim's cause of death was inconclusive. Here, in contrast, Hannah's statement to the PSI author that she had not received counseling for the sexual assault, if accurate, would have impeached only her testimony on the collateral issue of why her demeanor on the witness stand was unemotional. It would not have impeached any of Hannah's substantive testimony regarding the circumstances of the sexual assault or her identification of Hoyle as her assailant.

¶25 Furthermore, Hannah's statements regarding her counseling were not entirely inconsistent. Hannah testified at trial that she had discussed the assault in counseling, but she told the PSI author that she had not. In both instances, however, Hannah stated that the counseling she received had helped her to deal with the assault. In particular, while Hannah told the PSI author that she attended counseling once a week "for substance abuse" and had not discussed the assault with her counselor, she also stated that the counseling "has helped her a lot" and that "she still has trouble dealing with the assault at times, but no longer relies on drugs to help her through this." Thus, even if Hannah's statements to the PSI author had been introduced at trial, they would not have completely undermined Hannah's explanation for her unemotional demeanor while on the witness stand.

¶26 Under these circumstances, we agree with the State that there is no reasonable probability that the jury would have had a reasonable doubt as to Hoyle's guilt had it heard Hannah's statements to the PSI author regarding the counseling she received. Consequently, Hoyle is not entitled to a new trial based on newly discovered evidence. *See **Plude***, 310 Wis. 2d 28, ¶32.

## II. Hannah's counseling records

¶27    Hoyle next argues that if this court does not grant him a new trial on his newly discovered evidence claim, we should remand to the circuit court for a new hearing on that claim so that he may subpoena Hannah and her counseling records.[3]  We agree with the State that no remand is required because Hannah's counseling records are not necessary to decide the newly discovered evidence claim.

¶28    As discussed above, Hoyle's newly discovered evidence claim is based on Hannah's statement to the PSI author that she never discussed the sexual assault with her counselor, which was contrary to her trial testimony that she had received counseling for the sexual assault.  Hannah's conflicting statements on this point are already in the record.  While a review of Hannah's counseling records might reveal whether her statement to the PSI author about the scope of her counseling was accurate, our analysis of Hoyle's newly discovered evidence claim does not turn on the accuracy of that statement.  Instead, the dispositive issue is whether there is a reasonable probability that a jury, having heard the new evidence, would have a reasonable doubt as to Hoyle's guilt.  *See id.*  We have already concluded that no such reasonable probability exists.

---

[3] In his postconviction motion, Hoyle sought postconviction discovery of Hannah's counseling records pursuant to *State v. Shiffra*, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993), and its progeny.  However, our supreme court overruled *Shiffra* during the pendency of this appeal.  *See State v. Johnson*, 2023 WI 39, ¶1, 407 Wis. 2d 195, 990 N.W.2d 174.  We therefore granted Hoyle's request to allow the parties to submit supplemental briefs addressing "the postconviction discovery issue in light of *Johnson*."  Hoyle now argues that because *Shiffra* has been overruled, he should be allowed to subpoena Hannah and her counseling records at a new hearing on his newly discovered evidence claim.

¶29     Thus, even assuming that Hannah's counseling records confirm the accuracy of her statement to the PSI author, the records are not necessary to decide Hoyle's newly discovered evidence claim. We therefore deny Hoyle's request to remand this matter for a new hearing on the newly discovered evidence claim to allow him to subpoena Hannah and her counseling records.

### III. State's failure to disclose evidence

¶30     Finally, Hoyle seeks a new trial based on the State's failure to disclose evidence. A defendant has a due process right to the disclosure of any favorable evidence material to guilt or punishment that is in the State's possession. *State v. Wayerski*, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468 (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). When reviewing a circuit court's decision on a *Brady* claim, "we independently review whether a due process violation has occurred, but we accept the [circuit] court's findings of historical fact unless clearly erroneous." *Wayerski*, 385 Wis. 2d 344, ¶35.

¶31     "A *Brady* violation has three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material." *Wayerski*, 385 Wis. 2d 344, ¶35. With respect to the first prong, evidence is favorable when, "if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676 (1985). Under the second prong, "suppression is nondisclosure or the withholding of evidence from the defense. The prosecutor's mindset or 'passivity' is irrelevant to this suppression inquiry." *Wayerski*, 385 Wis. 2d 344, ¶58. Under the third prong, evidence is material "only if there is a reasonable probability that, had the evidence been

13

disclosed to the defense, the result of the proceeding would have been different." *Id.*, ¶61 (citation omitted).

¶32    Hoyle contends that "[t]he only document[] provided by the [S]tate during discovery regarding [Hannah's] initial disclosure of the sexual assault was a police report prepared by" Investigator Szotkowski.  According to that report, Szotkowski received an email from "Officer Joseph Nelson with [the] Chippewa Falls Police Department" on March 14, 2017,[4] stating that Hannah told Nelson that she had been sexually assaulted.  Hoyle asserts that during pretrial discovery, the State did not produce either Nelson's email to Szotkowski or any report prepared by Nelson regarding Hannah's initial disclosure of the assault.  Hoyle states, however, that he ultimately obtained a copy of the email through an open records request and that the State eventually provided a copy of Nelson's report after Hoyle filed his postconviction motion.

¶33    Addressing the first and third prongs of the *Brady* analysis, Hoyle contends that Officer Nelson's report and email are favorable to him and material because "[b]oth versions of [Hannah's] initial statement to Officer Nelson contain inconsistencies with her later statements, and suggest possible explanations for why [Hannah] would falsely accuse Hoyle of the assault."  Under the second prong of the *Brady* analysis, Hoyle asserts that the State suppressed this evidence by failing to turn it over to the defense.

¶34    The State, in turn, concedes that it "inadvertently" suppressed Officer Nelson's email and report. The State argues, however, that Hoyle is not

---

[4] While Investigator Szotkowski's report states that she received this email on March 14, 2017, the email was actually sent on March 13, 2017.

entitled to a new trial on this basis because Nelson's email and report "contain no previously unknown evidence that is both material and favorable to Hoyle."

¶35 We conclude that Hoyle's **Brady** claim fails because he has not shown that Officer Nelson's report and email are "material"—that is, that there is a reasonable probability that the result of Hoyle's trial would have been different had this evidence been disclosed to the defense. *See Wayerski*, 385 Wis. 2d 344, ¶61. In support of his **Brady** claim, Hoyle first notes that both the email and report state that Hannah told Nelson that he was the first person she told about the assault. Hoyle argues that these statements are "significant" because Hannah "later said to Investigator [Szotkowski] that she had told a friend about the assault the night it happened or the night after." Hoyle contends that if the State had disclosed Nelson's email and report, he "could have used this inconsistency to impeach [Hannah's] credibility, and to point out that there was yet another potential witness that the [S]tate neither investigated nor called to the witness stand."

¶36 Investigator Szotkowski's report actually states that during an interview on March 15, 2017, Hannah told Szotkowski that she "shared some of what happened with a friend of hers the night of the assault or the following night," but she "was not completely truthful with her friend." We agree with the State that Hannah's statement to Szotkowski is not necessarily inconsistent with her earlier statement that Officer Nelson was the first person she told about the assault because "sharing a partial—and only partially true—version of what happened that night is not the same as telling the whole true story." In addition, while Hoyle claims that he could have used this inconsistency "to point out that there was yet another potential witness" that the State failed to investigate—i.e., the friend to whom Hannah made the initial disclosure—that friend's existence

was revealed in *Szotkowski's* report, not in Nelson's report or email. Hoyle concedes that the State provided him with Szotkowski's report during pretrial discovery. Under these circumstances, there is no reasonable probability that the result of Hoyle's trial would have been different had Nelson's email and report been disclosed to the defense. *See Wayerski*, 385 Wis. 2d 344, ¶61.

¶37    Second, Hoyle notes that according to Officer Nelson's report, Hannah told Nelson that she was "on a bunch of pills, and smoked weed" on the day of the assault. Hoyle observes that Hannah subsequently testified at trial that she had taken pills and consumed alcohol that day. Hoyle asserts that if Nelson's report had been disclosed to the defense, he "could have used this inconsistency to impeach [Hannah's] credibility." We agree with the State, however, that Hoyle does not explain how this trivial discrepancy—i.e., whether Hannah consumed pills and weed or pills and alcohol on the day of the assault—would have had any significant impeachment value. Again, there is no reasonable probability that the result of Hoyle's trial would have been different had this evidence been disclosed to the defense. *See id.*

¶38    Third, according to Officer Nelson's report, Hannah told Nelson that Hoyle gave her cigarettes before the assault and then stated, "I gave you cigarettes, now you can give me something in return." Hoyle correctly observes that Hannah did not testify to these facts at trial, and he therefore asserts that he could have used Nelson's report to impeach Hannah's trial testimony regarding the circumstances leading up to the assault. We agree with the State, however, that if Hoyle had asked Hannah about these prior statements in Nelson's report, "[a]ny answer would [have been] at best indifferent and at worst damaging to the defense." If the defense had asked Hannah about her statements regarding cigarettes in Nelson's report, Hannah may have simply responded that she did not

remember making those statements, which would not have been particularly helpful to Hoyle's defense. Alternatively, Hannah may have confirmed that Hoyle did, in fact, give her cigarettes and then state that she owed him something in return. That response would have been damaging to the defense. We therefore fail to see how this evidence, if disclosed to the defense, would have created a reasonable probability of a different outcome at trial. *See id.*

¶39 Fourth, according to Officer Nelson's report, Hannah stated that after Hoyle made the comment about cigarettes, he locked the doors of the vehicle and then assaulted her. At trial, Hannah did not testify that Hoyle locked the vehicle's doors before the assault. Again, Hoyle argues that if the State had disclosed Nelson's report prior to trial, he could have cross-examined Hannah regarding this inconsistency. This argument is unpersuasive because it is undisputed that Hoyle had access to Investigator Szotkowski's report, which included Hannah's statement that "the guy locked the doors" before assaulting her. Thus, Hoyle could have used Szotkowski's report to cross-examine Hannah on this point at trial, and he did not need Nelson's report to do so. Under these circumstances, Hoyle has again failed to show that Nelson's report is material—that is, that it is reasonably probable the result of his trial would have been different had the report been disclosed to the defense. *See id.*

¶40 Fifth, Hoyle asserts that Officer Nelson's report and email "clarify that [Hannah's] initial disclosure did not come about as a result of [Hannah] seeking to speak with someone about the alleged assault." Instead, Nelson's email states that Hannah "was in my office talking about her drug dependence and she used this incident as an example of how low she goes when she is high/drunk." Hoyle contends that a jury "could reasonably discount [Hannah's] credibility because she first brought up the assault as an aside when discussing her drug use,

as opposed to being driven to disclose the incident by the assault itself." We do not agree that this additional information would have caused the jury to discount Hannah's credibility to the extent that there is a reasonable probability the result of Hoyle's trial would have been different had the State disclosed Nelson's report and email. *See id.* Arguably, the fact that Hannah did not come into Nelson's office with a plan to tell him that she had been sexually assaulted makes her disclosure more, not less, believable.

¶41 Sixth, Hoyle asserts that Officer Nelson's report and email support an inference that the police pressured Hannah to name her assailant after she initially refused to do so, which "suggests why [she] falsely implicated Hoyle in an assault." Hoyle theorizes:

> [W]hile discussing her drug and alcohol abuse with Officer Nelson, [Hannah] started telling him about a sexual experience she regretted, became embarrassed, and claimed it was forced rather than consensual. And because she did not want to get her actual partner in trouble, she refused to identify the alleged assailant.
>
> However, law enforcement then pressured her to name someone, and she later chose Hoyle, whom she knew through her former best friend.

¶42 In support of this theory, Hoyle cites the following statement from Officer Nelson's email: "Right now she did not seem interested in getting this guy in trouble, but I think I can convince her otherwise." Hoyle also cites Investigator Szotkowski's report, which states that during a May 10, 2017 interview with Nelson, Hannah "confirmed the subject who sexually assaulted her was T.J. (Tomas) Hoyle, [J.G.'s] stepbrother." Hoyle argues that Szotkowski's use of the word "confirmed" suggests that Nelson, not Hannah, "was the first one to name Hoyle as [Hannah's] assailant," which "would support a defense

18

argument that [Hannah] was simply going along with the government's suggestions."

¶43     We reject this argument for several reasons. As an initial matter, Hoyle places too much importance on Investigator Szotkowski's use of the word "confirmed" in her report. Her use of that word does not support a reasonable inference that it was Officer Nelson, rather than Hannah, who first named Hoyle as Hannah's assailant. In any event, as previously noted, Szotkowski's report was in Hoyle's possession before trial. Thus, Hoyle could have used that report to cross-examine Hannah on the issue of whether she or Nelson first raised Hoyle's name. Consequently, Hoyle did not need Nelson's report or email to pursue that line of inquiry.

¶44     Hoyle also places undue emphasis on Officer Nelson's statement that he would "convince" Hannah to name her assailant. We agree with the State that "[t]he whole point of police investigation is to uncover crimes and identify their perpetrators. Where, as here, a victim is reluctant to identify her assailant, the police have two choices: to investigate without the victim's assistance or urge the victim to make the identification." Like the State, we conclude that an officer's urging a victim to identify her assailant, without more, does not give rise to a reasonable inference that the victim made a false accusation as a result of improper pressure from law enforcement. That conclusion is particularly appropriate here, given that Nelson made his statement about "convinc[ing]" Hannah to name her assailant in a March 13, 2017 email, but Hannah did not actually name Hoyle as the perpetrator until May 10, 2017. As the State aptly notes, given that it took Hannah approximately two months to disclose her assailant's identity, "Nelson's purported attempts at coercion must have been pretty weak indeed."

19

¶45 Furthermore, additional facts belie Hoyle's claim that Hannah's identification of him was a last-minute fabrication caused by police pressure. Investigator Szotkowski noted in her initial report that Hannah told Officer Nelson that her assailant was twenty-two years old. Szotkowski later noted that during a March 15, 2017 interview, Hannah refused to name her assailant but said that he "was her old best friend's stepbrother."[5] Thus, two months before Hannah named Hoyle as her assailant, she had significantly limited the pool of potential suspects to males who were approximately twenty-two years old and who were the stepbrothers of Hannah's former best friend. The details that Hannah initially provided regarding her assailant's identity—and the fact that Hoyle generally fit Hannah's initial description—are inconsistent with a claim that Hannah's subsequent identification of Hoyle was a fabrication caused by police pressure.

¶46 For these reasons, we cannot conclude that any of the aspects of Officer Nelson's report and email that Hoyle has identified are material. In other words, Hoyle has not shown a reasonable probability that the result of his trial would have been different had Nelson's report and email been disclosed to the defense. *See Wayerski*, 385 Wis. 2d 344, ¶61. Accordingly, the circuit court did not err by denying Hoyle's *Brady* claim.

> *By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[5] Hannah confirmed at trial that Hoyle was the stepbrother of her former best friend. In addition, the record shows that Hoyle was approximately one month shy of his twenty-first birthday at the time of the assault.